UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                Plaintiff,

    v.                                   Case No. 22-cv-585-pp

ANN YORK, MEGAN LEBERAK,
ANDREA BLEECKER, VICK GWENDOLYN,
BRIAN TAPLIN, ROBERT WEINMAN,
MARY ANN MOORE, CHERYL JEANPIERRE,
JOSEPH BEAHM, ROBERT RYMARKIEWICZ,
RANDELL HEPP, EMILY PROPSON, CASEY ROCA
and TORRIA VAN BUREN,

                Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED
WITHOUT PREPAYING FILING FEE (DKT. NO. 2), GRANTING MOTION TO
AMEND COMPLAINT (DKT. NO. 7), SCREENING AMENDED COMPLAINT
UNDER 28 U.S.C. §1915A (DKT. NO. 8) AND DENYING WITHOUT
PREJUDICE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 11)**

---

Plaintiff Timothy Durley, who is incarcerated at Waupun Correctional

Institution and is representing himself, filed a complaint under 42 U.S.C.

§1983, alleging that the defendants violated his civil rights. On August 22,

2022, the court received a letter from the plaintiff in which he stated his intent

to file an amended complaint "to add new defend[a]nts etc [and] also [he] forgot

to add details when [he] filed [the] complaint." Dkt. No. 7. He asked the clerk to

send him an amended complaint form, which the clerk's office sent the next

day. Id. On September 6, 2022, the court received the plaintiff's proposed

amended complaint. Dkt. No. 8.

Under Federal Rule of Civil Procedure 15, "[a] party may amend its pleading once as a matter of course within" twenty-one days of service or within twenty-one days after service of a responsive pleading. Fed. R. Civ. P. 15(a)(1). Because the defendants have not yet been served, the plaintiff's request to amend falls within the timeframe in Rule 15(a). The court will grant the plaintiff's request to amend his complaint. This decision also resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, screens his amended complaint, dkt. no. 8, and rules on his motion to appoint counsel, dkt. no. 11.

## I. Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)

The Prison Litigation Reform Act ("PLRA") applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with his case without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On May 27, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $1.53. Dkt. No. 6. The court received that fee on June 10, 2022. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

2

## II. Screening the Amended Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the amended complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, the amended complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The amended complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.     The Plaintiff's Allegations

In his amended complaint, the plaintiff has sued fourteen defendants, all of whom work at Waupun: Registered Nurses Ann York, Megan Leberak, Andrea Bleecker, Vick Gwendolyn and Brian Taplin; Assistant Manager Robert Weinman; Doctors Mary Ann Moore and Cheryl Jeanpierre; Sergeant Joseph Beahm and Captain Robert Rymarkiewicz; Warden Randell Hepp; Deputy Warden Emily Propson; and Psychological Services Unit ("PSU") Doctors Casey Roca and Torria Van Buren. Dkt. No. 8 at 1, 3–4.

The amended complaint alleges that on March 16, 2022, the plaintiff was housed in the Restricted Housing Unit ("RHU"). Id. at 5. He alleges that around midnight or 1:00 a.m., he "woke up throwing up blood, white and brown stuff." Id. He told the person housed next to him to "yell medical emergency," and several incarcerated persons began kicking their doors and yelling "medical emergency." Id. Sergeant Beahm arrived at the plaintiff's cell door, as the

4

plaintiff was vomiting, and the plaintiff asked Beahm if Beahm's body camera was recording. Id. When Beahm confirmed that it was and that he had seen the plaintiff vomit, the plaintiff told Beahm he "believe[d] [he] was poison[ed], and need[ed] a nurse." Id. The plaintiff notes that his "food tasted funnie [*sic*]" the previous day, March 15, 2022. Id. at 6. Beahm told the plaintiff he would inform Nurse York and left the cell. Id. at 5–6. Beahm returned about a half hour later and told the plaintiff that York had said to take the plaintiff's inhaler. Id. at 6. The plaintiff replied he was not having trouble breathing. Id. Beahm responded, "due to your '3[-]man [restriction]' we[']re not bringing you out," and he walked away. Id. He says Nurse York never came to see him. Id.

The plaintiff alleges he threw up all night and eventually passed out. Id. He awoke in the nurse's station in the restricted housing unit, where Nurse Leberak asked him what happened. Id. He told her he believed he had been poisoned, and she responded, "no you weren[']t." Id. Leberak provided him liquid Pepto Bismol, which he "immediately thr[ew] up." Id. Captain Rymarkiewicz told Leberak, "[I] guess we can wheel him to the strip[] cell to cool off." Id. The plaintiff asked Rymarkiewicz to loosen his handcuffs, which he believed were too tight. Id. Rymarkiewicz told the plaintiff he would not remove the handcuffs until the plaintiff was "ready to go back to [his] cell." Id. The plaintiff says he was left in the strip cell for four hours, wearing the tight handcuffs. Id.

Nurse Bleecker eventually came to the plaintiff's cell and gave him "a pill that dissolved and water," which he threw up in the trash. Id. The plaintiff told

5

Bleecker he was poisoned and needed to go to the hospital. Id. Bleecker responded, "[W]hat you want me to do[?]" and walked away. Id. The plaintiff says he was returned to his cell, and another prisoner told him Captain Rymarkiewicz "was present at [his] cell door, when [he] was wheeled out to the nurses station." Id. at 6–7.

The plaintiff says he saw Nurse Taplin the same day and told Taplin he had been poisoned and needed to go to the hospital. Id. at 7. Taplin told the plaintiff "he [couldn't] do that for [him]." Id. Taplin gave the plaintiff "a liquid substance to drink," which he threw up later that night. Id. The plaintiff told Taplin he was going to go on a water and hunger strike, and Taplin said "ok" and for the plaintiff to write the Health Services Unit ("HSU"). Id. The plaintiff says he began a hunger and water strike on March 16, 2022, because he believed "[his] blood and urine was going to be taken for poison, which it wasn[']t." Id.

The plaintiff saw Doctor Moore the next week, who "did nothing" when the plaintiff told her he had been poisoned and threw up "thick white stuff" in front of her. Id. Moore told the plaintiff "she heard 'two' different stories" about the plaintiff being poisoned. Id. Moore told the plaintiff she would schedule him to see Doctor Jeanpierre. Id. When the plaintiff saw Jeanpierre and told her he had been poisoned, she responded, "no you weren[']t," and the plaintiff questioned why she did not run a blood or urine test or send him to the hospital. Id. Jeanpierre replied that the plaintiff "didn[']t warrant it." Id. He says Jeanpierre gave him "several non effective medications" that he threw up.

6

Id. She also scheduled an x-ray "after a month and something from [his] poisoning on 3-16-2022." Id. The plaintiff says Captain Rymarkiewicz denied the x-ray and told him "the cuffs have to come off, despite him having taser and pepper spray and 3 officers with him." Id. at 7–8.

The plaintiff says he wrote to Assistant Manager Weinman "concerning all of this and [his] treatment during this whole ordeal in which [Weinman] replied to [his] complaints and requests and has done nothing." Id. at 8. He says Weinman "did tr[y] to take [his] blood for poison after a month and a half," but the plaintiff refused to allow Weinman to take his blood "due to nume[r]ous complaints [he] filed against [Weinman] and how [he] complain[ed] to 'hsu' on 'RNs' constantly poking [his] arm missing the vein, laughing, saying sorry, but doing it again." Id. The plaintiff says he told Weinman he "prefer[s] a different nurse to take [his] blood or the hospital" but Weinman told him "it[']s either me or I mark you as refusal." Id. The plaintiff refused to allow Weinman to take his blood. Id.

He plaintiff says Nurse Gwendolyn also "did nothing" despite responding to his HSU requests and knowing about his pain and vomiting. Id. He does not provide her responses or say what her responses were. Id. The plaintiff says he wrote to Warden Hepp and Deputy Warden Propson "concerning all of this and how [he] was treated during this whole ordeal" and asking that the Warden remove his three-man restriction because it "is affecting [him] receiving 'hsu' services" and to provide him "a hearing concerning [his] '3[-]'man' restriction." Id. at 8–9. He says Hepp and Propson responded that he is "basically on

7

permanent 3[-]man [restriction]." Id. at 9. He says he made Rymarkiewicz "aware of this as well," but his requests have been "disregarded." Id.

The plaintiff alleges his x-ray was rescheduled a week later after Rymarkiewicz cancelled the first one. Id. But the plaintiff refused the x-ray because of "pain-ache [he] was having and how it hurted [*sic*] when [he] turn [his] body." Id. The plaintiff wrote to Doctors Roca and Van Buren "concerning this and how [he] was poison[ed] and treated and requested to talk to 'PSU' and requested that 'PSU' do something etc." Id. He says both doctors "failed to act-intervene" and told him he may speak with PSU doctors only at his cell front or over the intercom because of his three-man restriction. Id. The plaintiff says he does not like these options because "the intercom is loud and [he] talk[s] loud as well and other inmates and staff would hear [the] conversation." Id.

The plaintiff attached the report from an institutional complaint he filed on March 22, 2022 about being poisoned. Id. at 22. The document indicates that Beahm was contacted and stated that as he was speaking with the person housed next to the plaintiff, the plaintiff claimed to be throwing up. Id. at 23. Beahm contacted York, who said that "just throwing up was not . . . an emergent issue." Id.

The complaint examiner notes that the plaintiff filed a request to the Health Services Unit on March 16, 2022, stating that he was beginning a hunger and water strike. Id. The complaint examiner also notes that the plaintiff "is also a three-man escort which makes movement on third shift null for a non emergent issue." Id. She notes that the plaintiff was taken to the

nurse's station on March 17, 2022 at 7:40 a.m. for reports of stomach pain and vomiting. Id. Medical staff noted that his "vomit was brown and clear with no solids and he was given medication and see[n] again later in the day as a follow up. Again, no emergency indicated." Id. Because medical staff did not see any blood in the plaintiff's vomit, they "did not feel the situation was emergent and the inmate was seen right away the next morning." Id. The complaint examiner notes, "No records show any indication of any poisoning and with the inmate's statements of a hunger/water strike it is unclear how he was 'poisoned.'" Id. The complaint examiner recommended dismissing the complaint. Id.

On April 19, 2022, Hepp accepted the complaint examiner's recommendation and dismissed the plaintiff's complaint. Id. at 25. The plaintiff appealed, and on May 6, 2022, a corrections complaint examiner reviewed the appeal and concluded that prison staff "took appropriate actions and notified the HSU," which "determined it to be non-emergent." Id. at 26. The corrections complaint examiner recommended dismissing the appeal. Id. On May 16, 2022, the Office of the Secretary accepted the corrections complaint examiner's recommendation and dismissed the appeal. Id. at 27.

The plaintiff also attached the report for an institutional complaint he filed on May 3, 2022, complaining about the Health Services Unit not seeing him for his pain. Id. at 17. A complaint examiner contacted Weinman, who reported that the plaintiff "has seen provider and nursing multiple times. No complaints of pain noted. No one is ignoring him." Id. The complaint examiner accepted Weinman's report and declined to "engage in an evaluation of the

9

quality of care versus the demonstrated need as that discussion lays within the bounds of professional medical discretion." Id. The complaint examiner concluded that the plaintiff's beliefs about his treatment "do not carry the day when measured against the factual statements and evidence provided by HSM Weinman." Id. The complaint examiner recommended dismissing the complaint. Id.

On May 27, 2022, the reviewing authority noted that the plaintiff was seen on April 11, April 25, and April 29, 2022. Id. at 18. The reviewing authority noted that the plaintiff "[d]id mention some discomfort, but claimed it was due to poison, so was treated for the complaint of poison." Id. The reviewing authority also notes that the plaintiff "refused labs on 4/29." Id. The reviewing authority accepted the complaint examiner's recommendation and dismissed the plaintiff's complaint. Id.

On June 6, 2022, the corrections complaint examiner received the plaintiff's appeal from the dismissal of his complaint. Id. at 19. The examiner reviewed the reviewing authority's decision noting the plaintiff had received previous medical treatment. Id. The examiner found that the plaintiff "ha[d] provided no new information on appeal to warrant recommending overturning that decision" and recommended dismissing the appeal. Id. On June 29, 2022, the Office of the Secretary accepted that recommendation and dismissed the appeal. Id. at 21.

The plaintiff has sued the defendants in their individual capacities for violating his rights under the Eighth Amendment by failing to provide adequate

medical care when he was throwing up, deliberate indifference to his medical needs and failing to act or intervene when he was throwing up and related to his three-man restriction. Id. at 11. He accuses the defendants of doing nothing in response to his slips requesting medical treatment and his allegations of being poisoned. Id. at 11–12. He sues Rymarkiewicz for not loosening his tight handcuffs and for denying him an x-ray. Id. at 12–13. He also sues Rymarkiewicz for violating "14th Amendment due process, and 1st Amendment, Retaliation." Id. at 13. He says Rymarkiewicz "has in the pas[t] refused to loos[en] tight[] handcuffs and refuse to give [the plaintiff] a hearing on [his] '3[-]man' restriction which [is] suppose[d] to be every 30 days a review." Id. at 13.

The plaintiff seeks compensatory and punitive damages for each day he "wasn[']t seen and nothing that was being done" and for his "pain and suffering, pain and aches in [his] stomach and in [his] sides." Id. at 14. The plaintiff also seeks what he calls "Declaratory Judgement," but this relief is more appropriately construed as a request for four injunctions. Id. He asks the court to order the prison to remove his three-man escort restriction. Id. He asks to be transferred to Columbia Correctional Institution or the Wisconsin Secure Program Facility. Id. He wants the Wisconsin Department of Corrections to "change[] its policy on how it deals with inmates, male or female concerning them alleging they was poison[ed]." Id. Finally, he asks that the Wisconsin DOC create a phone number that incarcerated persons can call to begin an investigation into their alleged poisoning. Id.

C.    <u>Analysis</u>

The court reviews the plaintiff's claims of inadequate medical treatment under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." <u>Gabb v. Wexford Health Sources, Inc.</u>, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting <u>Pyles v. Fahim</u>, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the incarcerated person must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)); <u>see</u> <u>Estelle</u>, 429 U.S. at 103.

To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." <u>Greeno v. Daley</u>, 414 F.3d 645, 653 (7th Cir. 2005). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." <u>Farmer</u>, 511 U.S. at 835. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." <u>Perez</u>, 792 F.3d at 776 (citing <u>Farmer</u>, 511 U.S. at 837). It is not enough to allege "'[n]egligence, gross negligence, or even 'recklessness' as that term is used in tort cases.'" <u>Burton v.</u>

<u>Downey</u>, 805 F.3d 776, 785 (7th Cir. 2015) (quoting <u>Shockley v. Jones</u>, 823 F.2d 1068, 1072 (7th Cir. 1987)). The plaintiff must show that the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." <u>Greeno</u>, 414 F.3d at 654 (quoting <u>Snipes v. DeTella</u>, 95 F.3d 586, 592 (7th Cir. 1996)).

The plaintiff alleges that the defendants unreasonably responded to his statements that he believed he had been poisoned, which was causing him to vomit. "But prison guards are neither required nor expected to believe everything inmates tell them." <u>Olson v. Morgan</u>, 750 F.3d 708, 713 (7th Cir. 2014) (citing <u>Riccardo v. Rausch</u>, 375 F.3d 521, 527 (7th Cir. 2004)). Neither medical nor non-medical officials are deliberately indifferent for disbelieving an incarcerated person's unreasonable claim, even if it later turns out they were mistaken about that claim. <u>See</u> <u>Horshaw v. Casper</u>, 910 F.3d 1027, 1029 (7th Cir. 2018) (no deliberate indifference where guard reasonably disbelieves prisoner's assertion); <u>Withers v. Wexford Health Sources, Inc.</u>, 710 F.3d 688, 690 (7th Cir. 2013) (no deliberate indifference if nurse mistakenly believed that plaintiff lied about his pain). The complaint does not state a claim that any defendant was deliberately indifferent to the plaintiff's claim that he had been poisoned.

The plaintiff says that Beahm did not respond appropriately to his vomiting and concerns of being poisoned. The documents relating to the plaintiff's institutional complaint show that Beahm contacted Nurse York, who told Beahm that vomiting was not an emergent issue. Beahm relayed that

message to the plaintiff. He also told the plaintiff that he would not take the plaintiff out of his cell because the plaintiff had a restriction requiring a three-person escort in the RHU, and staff was limited because it was after midnight. These allegations do not indicate that Beahm was deliberately indifferent to the plaintiff's medical condition. Beahm, a non-medical prison official, contacted York, a nurse, about the plaintiff's condition. He was "entitled to defer to the judgment of jail health professionals so long as he did not ignore [the incarcerated person]," and the plaintiff has not alleged that Beahm ignored him. Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010); see Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) (non-medical defendants may rely on the expertise of medical personnel). Because York informed Beahm that vomiting alone was not a medical emergency, Beahm had no reason to call for assistance to remove the plaintiff from his cell (which would have required implementation of the three-man escort restriction). The plaintiff has not stated a claim against Beahm.

The plaintiff has not alleged that he saw York or that she treated him. He alleges only that Beahm contacted her, and that she told Beahm to take the plaintiff's inhaler but never saw him. As noted, an institutional complaint examiner learned that York had told Beahm that vomiting was not an emergent issue, which meant the plaintiff did not need to be removed from his cell or immediately treated. The plaintiff alleges that he experiences continued pain and ailments that he attributes to his vomiting. But even if York's assessment of his condition as non-emergent was incorrect, that would demonstrate only

that York was negligent to the plaintiff's concern. See Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."). Because negligence does not violate the Constitution, the complaint does not state a claim against York.

Nor does the complaint state a claim against Leberak or Bleecker. The plaintiff says Leberak spoke with him when he woke up in the nurse's station and asked him what happened. She disagreed with his belief that he had been poisoned and gave him Pepto Bismol, but he threw it up. Bleecker gave the plaintiff "a pill that dissolved and water," which he also vomited up. Medical professionals may be liable for pursuing "a course of treatment known to be ineffective." Greeno, 414 F.3d at 655. But they are not liable for pursuing *different* treatments, even if they are unsuccessful. Reck v. Wexford Health Sources, Inc., 27 F.4th 473, 483 (7th Cir. 2022). That the nurses' treatment did not stop the plaintiff's vomiting does not mean it was so "blatantly inappropriate as to evidence intentional mistreatment." Greeno, 414 F.3d at 654.

The plaintiff alleges that both Bleecker and Taplin told him they could not send him to the hospital. Taplin instead told the plaintiff to write to the Health Services Unit, which the plaintiff did. Neither nurse is liable for the Health Services Unit's decision to deny the plaintiff's request to go to the hospital. Nor are Bleecker or Taplin liable for denying the plaintiff his preferred treatment (a trip to the hospital, blood and urine tests), which they told him

was outside of their authority. See Christopher v. Liu, 861 F. App'x 675, 679–80 (7th Cir. 2021) (citing Arnett, 658 F.3d at 754) ("[T]he Eighth Amendment does not give prisoners the right to demand specific medical treatment, let alone treatment by a specific provider.").

The complaint alleges that Moore "did nothing" in response to the plaintiff's complaints of vomiting and claim that he had been poisoned. But the plaintiff also alleges that Moore tried to clarify his claim of poisoning and then scheduled him to see Jeanpierre, whom he later saw for an appointment. The plaintiff's own allegations refute his claim that Moore did nothing and was indifferent to his claim that he had been poisoned. Moore may not have believed the plaintiff, but she listened to his complaints and scheduled him to see a doctor. Those actions were not "blatantly inappropriate" and do not show deliberate indifference.

The plaintiff saw Jeanpierre, who also told him that he had not been poisoned and that his condition was "not serious." She nonetheless scheduled the plaintiff for an x-ray; the plaintiff says Rymarkiewicz denied him the first x-ray because of his three-man escort restriction, and the plaintiff refused the second x-ray because he was in pain. The plaintiff's allegations demonstrate that Jeanpierre was not deliberately indifferent to his condition. She disagreed with his assessment that he had been poisoned. Her disagreement with the plaintiff's self-diagnosis, and the plaintiff's disagreement with her opinion, do not state an Eighth Amendment claim. See Berry, 604 F.3d at 441; Pyles, 771 F.3d at 409.

The plaintiff's only allegation against Nurse Gwendolyn is that she responded to his requests to the Health Service Unit. The plaintiff does not say what her responses were, but he asserts she "did nothing" to treat his condition. But by the time the plaintiff wrote to Nurse Gwendolyn, six nurses and at least one doctor had addressed his vomiting. At least one nurse and one doctor concluded that his condition was not serious, and the various nurses tried different treatments. The plaintiff has not suggested that Nurse Gwendolyn should have done something else that any other nurse had not tried. The plaintiff believes he should have been sent to a hospital, but the plaintiff was entitled only to reasonable care, not his preferred method of care. See Burton, 805 F.3d at 785 (detainees are not entitled to unqualified access to healthcare); Forbes v Edgar, 112 F.3d 262, 267 (7th Cir. 1997) (the Eighth Amendment does not entitle incarcerated persons to demand specific care, or to the best care possible). Because the plaintiff's own allegations show he was provided reasonable care, he has not stated a claim against Nurse Gwendolyn or any medical professionals.

The plaintiff does not allege that he saw or spoke with Weinman on March 16, 2022, or that Weinman provided him medical care for his vomiting. The plaintiff alleges only that Weinman is the "assistan[t] manager," was aware of what happened and "did nothing." Dkt. No. 1 at 5. The court presumes that the plaintiff means that Weinman is the assistant manager of the Health Services Unit. But a health services manager cannot be held liable unless he had knowledge of the plaintiff's treatment or the authority to intervene in it; the

17

plaintiff must show that the health services manager was "personally involved in his care" to establish liability. Machicote v. Roethlisberger, 969 F.3d 822, 828 (7th Cir. 2020) (citing Minix v. Canarecci, 597 F.3d 824, 833–34 (7th Cir. 2010)). To be held liable under 42 U.S.C. §1983, Weinman must have known about the nurses' conduct, which the plaintiff says he did, and facilitated, approved or condoned it or "turn[ed] a blind eye" to it. Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001). The complaint does not allege that Weinman was aware of the nurses' actions as they occurred. It alleges that Weinman "was made aware" after the fact. Dkt. No. 1 at 5. That Weinman learned about what had happened later is not sufficient to make him liable for the nurses' conduct at the time. Even if it was, the court concludes that the complaint does not state a claim against any nurse or doctor, so there is nothing for which Weinman may be held responsible.

The plaintiff does allege that about a month and a half after he fell ill on March 16, 2022, Weinman attempted to obtain a blood sample from the plaintiff, but the plaintiff refused because he has filed numerous complaints against Weinman and nurses. He asked instead to have a different nurse take his blood sample or to be taken to a hospital for the blood draw, but Weinman told him either he would take the plaintiff's blood sample or he would record that the plaintiff refused it. The court understands the plaintiff's hesitance in allowing a medical official about whom he has complained to take his blood sample. But as the court noted above, incarcerated persons are not entitled to demand specific care or to demand treatment by a specific provider or in a

specific facility. Burton, 805 F.3d at 785; Forbes, 112 F.3d at 267. The plaintiff does not allege that Weinman ever took his blood in the past or acted inappropriately when he did; he says only that other nurses did a poor job. Nor does he allege that he believed Weinman would injure him when attempting to take his blood sample. If that occurred, the plaintiff may have a different claim against Weinman. But Weinman did not violate the plaintiff's rights by declining to allow another nurse or a hospital official take his blood sample.

The plaintiff claims that Rymarkiewicz put him in unnecessarily tight handcuffs and left him that way for several hours, causing him injury. "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). In the context of a claim of excessive force, the plaintiff must show both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6 (citing Whitley, 475 U.S. at 320–21).

The plaintiff alleges that he told Rymarkiewicz that the handcuffs were too tight, and Rymarkiewicz responded that he would remove the handcuffs only when the plaintiff was ready to return to his RHU cell. The plaintiff says he was left in the strip cell for four hours wearing the tight handcuffs. The

complaint does not suggest that the plaintiff presented a risk or threat to prison staff or himself while he was locked in the strip cell. The plaintiff alleges that he suffered nerve damage and cuts on his wrist from the handcuffs. "[A]n officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." Stainback v. Dixon, 569 F.3d 767, 772 (7th Cir. 2009); see Hope v. Pelzer, 536 U.S. 730, 737–38 (2002). Accepting the plaintiff's allegations as true, the complaint states a claim of excessive force against Rymarkiewicz for leaving the plaintiff in unnecessarily tight handcuffs for four hours, causing him injury.

The plaintiff also says Rymarkiewicz violated his rights under the First Amendment by retaliating against him. To state a claim of retaliation, the plaintiff must allege that "he engaged in a protected activity," "he suffered a deprivation likely to prevent future protected activity," and "his protected activity was a motivating factor in the defendants' decision to retaliate." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citing Perez, 792 F.3d at 783). An incarcerated person who files institutional complaints about his treatment, as the plaintiff has, engages in protected activity. Pearson v. Welborn, 471 F.3d 732, 741 (7th Cir. 2006). The amended complaint satisfies the first of the three elements for a claim of retaliation.

But the amended complaint does not satisfy the second or third elements. To prove the second element, the plaintiff must show that the alleged misconduct "'would likely deter a person of ordinary firmness from continuing

to engage in protected activity.'" <u>Douglas v. Reeves</u>, 964 F.3d 643, 646 (7th Cir. 2020) (quoting <u>Surita v. Hyde</u>, 665 F.3d 860, 878 (7th Cir. 2011)). To satisfy the third element, he must show that the defendant knew about his protected conduct and acted because of it. <u>See</u> <u>Healy v. City of Chi.</u>, 450 F.3d 732, 740–41 (7th Cir. 2006). In other words, the plaintiff must show that the protected activity "was the but-for cause" of the adverse action. <u>Winston v. Fuchs</u>, 837 F. App'x 402, 404 (7th Cir. 2020) (citing <u>Nieves v. Bartlett</u>, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019) (explaining that the official's retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive")).

The plaintiff does not explain what conduct Rymarkiewicz engaged in that he believes was in retaliation for the plaintiff filing his complaints. He says Rymarkiewicz placed him in tight handcuffs, refused to remove his three-man escort restriction and cancelled his first x-ray appointment because of his three-man restriction. But he does not allege that Rymarkiewicz knew about his institutional complaints or that he did any of those things *because* the plaintiff filed them. The plaintiff says Rymarkiewicz placed him in tight handcuffs, but that occurred *before* the plaintiff filed complaints about his medical treatment; he says Rymarkiewicz refused to remove his three-man restriction because it was "permanent;" and he says Rymarkiewicz cancelled his first x-ray appointment because of his three-man restriction. Because the amended complaint fails to tie any of Rymarkiewicz's actions to the plaintiff's protected conduct, it does not state a First Amendment claim of retaliation.

The plaintiff also asserts that Rymarkiewicz has in the past refused to provide the plaintiff a review of his three-man escort restriction, which is supposed to occur every thirty days. "The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property." Isby v. Brown, 856 F.3d 508, 524 (7th Cir. 2017). To determine whether a prison restriction deprived the plaintiff of a liberty or property interest, the court first must determine whether he had such an interest; if so, the court must determine what process he was due before the state could restrict it. Id. (citing Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016)). A prison restriction will not give rise to a protected liberty interest unless it imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Prison restrictions must constitute "a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty under the Sandin doctrine." Paige v. Hudson, 341 F.3d 642, 643 (7th Cir. 2003).

The plaintiff alleges that he is on a three-man escort restriction when he is moved throughout Waupun. He suggests that his first x-ray appointment was cancelled because of this restriction. He says prison officials are supposed to review this restriction every thirty days, but that Rymarkiewicz has refused him this review in the past. He does not specify when Rymarkiewicz denied him the review or how often he has done so. But he also says Hepp and Propson told him his restriction is "basically . . . permanent." Dkt. No. 8 at 9. That

suggests Rymarkiewicz may not have conducted the thirty-day review because the warden or deputy warden determined it was not necessary. The allegations in the amended complaint raise more questions about the plaintiff's restriction than they answer. Out of an abundance of caution, the court will allow the plaintiff to proceed on this claim under the Fourteenth Amendment against Rymarkiewicz. The plaintiff will need to provide significant additional detail about this claim to survive a motion to dismiss or motion for summary judgment.[1]

The plaintiff asserts that Hepp and Propson reviewed his complaints about his treatment but did not take any action. As with his claim against Weinman, Hepp and Propson may be held liable only if they knew about the nurses' and doctors' actions as they occurred and failed to intervene. The amended complaint alleges only that Hepp and Propson did not intervene after the fact when the plaintiff wrote institutional complaints to them. The court has concluded that no nurse or doctor acted with deliberate indifference to the

---

[1] Ordinarily the court would dismiss this claim and order the plaintiff to pursue it in a separate lawsuit. That is because a plaintiff cannot bring unrelated claims against different defendants in the same case. George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007); Fed. R. Civ. P. 18(a) and 20(a)(2). The plaintiff's due process claim about not receiving hearings to review his three-man escort restriction is unrelated to his claim about the medical treatment he received (or did not receive) on March 16, 2022, and it is asserted only against Rymarkiewicz. Wheeler v. Wexford Health Sources, Inc., 689 F.3d 680, 683 (7th Cir. 2012) ("A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot."). Because the court is allowing the plaintiff to proceed only against Rymarkiewicz, however, it will allow him to proceed on both viable claims he has against that defendant. Id. ("[A] plaintiff may put in one complaint every claim of any kind against a single defendant, per Rule 18(a) . . . .").

plaintiff's serious medical needs. That means there is no misconduct for which Hepp and Propson may be responsible for failing to correct or respond to. The plaintiff also says Hepp and Propson did not remove his three-man restriction and instead told him it was "basically . . . permanent." Dkt. No. 8 at 9. As the court explains below, prison officials have the authority to decide what restrictions are appropriate for persons incarcerated within their institution. That the plaintiff disagrees with the restrictions Hepp and Propson have decided are appropriate for him does not mean they have violated his rights.

The plaintiff asserts that PSU doctors Roca and Van Buren did not intervene in his medical treatment. He says they told him they would speak with him but only at his cell front or over the intercom because of his three-man escort restriction. The plaintiff refused those options. Again, the plaintiff is not entitled to the specific treatment he wants, even from PSU staff. The plaintiff says Roca and Van Buren gave him the option of speaking at his cell front or over the intercom. He may not like those options, but they are reasonable alternatives to in-person treatment given the plaintiff's three-man restriction. The amended complaint does not state a claim against Roca or Van Buren.

The plaintiff seeks injunctions ordering removal of his three-man escort restriction, his transfer to another facility and the creation of a policy and phone number for incarcerated persons who believe they have been poisoned. As the court has informed the plaintiff in other cases he has pending in this district, "The court does not . . . have the authority to order an inmate to be

24

housed in a certain part of an institution." <u>Durley v. Tritt</u>, No. 21-CV-281-pp,
2021 WL 1626443, at *3 (E.D. Wis. Apr. 27, 2021) (citing <u>Westefer v. Neal</u>, 682
F.3d 679, 683 (7th Cir. 2012); <u>Johnson v. Eckstein</u>, No. 18-CV-1696-pp, 2019
WL 4540279, at *4 (E.D. Wis. Sept. 19, 2019); and <u>Capoeria v. Pollard</u>, No. 16-
CV-224-la, 2016 WL 1452398, at *4 (E.D. Wis. Apr. 13, 2016)). The court also
does not have the authority to change the plaintiff's restriction or to create a
new policy for incarcerated persons who believe they have been poisoned.
Those are decisions solely within the discretion of prison officials. <u>See</u> <u>Westefer</u>,
682 F.3d at 683 ("[P]rison officials have broad administrative and discretionary
authority over the institutions they manage." (internal quotation marks and
citation omitted)).

The court will allow the lawsuit to proceed only against defendant
Rymarkiewicz on the plaintiff's excessive force and Fourteenth Amendment due
process claims. He may proceed only on his request for damages. He may not
proceed on any other claim against any other defendant or for any other relief.

## III. Plaintiff Motion for Appointment of Counsel (Dkt. No. 11)

The plaintiff has asked the court to appoint a lawyer to represent him.
Dkt. No. 11. He explains that he cannot afford to hire a lawyer, that he has
asked for leave to proceed without prepaying the filing fee, that his
imprisonment will impede his ability to litigate, that the issues in his case are
complex and will require "significa[nt] resource[s] and knowledge of the law,"
that a trial will likely involve conflicting testimony and counsel would be better

able to litigate a trial and that the plaintiff has made "repeated efforts to obtain a lawyer." Id.

The plaintiff attached to his motion a declaration in which he indicates that there are a dozen different defendants in the case, that the case involves medical issues that might require expert testimony, that the case will require discovery and depositions of a number of witnesses, that he has only a high school education and a bit of college, that he has no legal education, that he is in restricted housing and has limited access to legal materials and that he has a limited ability to investigate and find witnesses. Dkt. No. 13. The plaintiff also attached a letter from one law firm, indicating that it was not able to represent him. Dkt. No. 13-1 at 1.

In a civil case, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Eagan v. Dempsey,

987 F.3d 667, 682 (7th Cir. 2021) (quoting Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007)). And, given the scarcity of *pro bono* counsel resources, the court may also consider the merits of a plaintiff's claim and what is at stake. Watts v. Kidman, 42 F.4th 755, 763-64 (7th Cir. 2022).

To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Auth., 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." Eagan, 987 F.3d at 682. To demonstrate he satisfied the first prong, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. Pickett, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. Id. The court should also consider how well the plaintiff articulated his case to the prospective lawyer. Id. Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to

intervene" and recruit counsel. Id. But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." Id.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." Eagan, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019). The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The plaintiff has not satisfied either prong of the Pruitt inquiry. First, he has not demonstrated that he tried to find a lawyer on his own by contacting at least three lawyers and providing proof that he did so. He has provided proof that he contacted one law firm—the American Civil Liberties Union. Second,

the plaintiff has not demonstrated that at this early stage, he is not capable of representing himself. In fact, since December 21, 2020, the plaintiff has filed twelve civil rights complaints in this district. He has filed pages and pages of motions, declarations and letters. He has demonstrated—in this case and others—that despite his lack of legal education, he is more than capable of explaining his claims and the facts that support them. His concern that the case involves many defendants has been resolved by this decision; only one defendant remains. His concerns that the case involves medical issues which may require expert testimony have been resolved by this decision; the only claims that remain are an excessive force claim and a Fourteenth Amendment due process claim. His concerns about the difficulties of litigating the case are premature; at this point, the next step is for the remaining defendant to answer or otherwise respond to the complaint. If the defendant answers, the court will issue a scheduling order for completing discovery. The plaintiff has participated in discovery in his other cases and is familiar with the process.

The case may reach a point where the plaintiff is not capable of handling it himself. But his many filings show that that point has not yet come, and likely will not come for some time. The court will deny the motion without prejudice.

## IV.    Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **GRANTS** the plaintiff's motion to amend his complaint. Dkt. No. 7. The amended complaint at Dkt. No. 8 is the operative complaint going forward.

The court **ORDERS** that defendants Ann York, Megan Leberak, Andrea Bleecker, Vick Gwendolyn, Brian Taplin, Robert Weinman, Mary Ann Moore, Cheryl Jeanpierre, Joseph Beahm, Randell Hepp, Emily Propson, Casey Roca and Torria Van Buren are **DISMISSED**.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 11.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the complaint and this order to the Wisconsin Department of Justice for service on defendant Robert Rymarkiewicz. Under the informal service agreement, the court **ORDERS** the defendant to respond to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$348.47** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the

transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Waupun Correctional Institution.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[2] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the

---

[2] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Case 2:22-cv-00585-PP   Filed 11/01/22   Page 31 of 32   Document 14

clerk of court of any change of address. The court also advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing the case without further notice.

Dated in Milwaukee, Wisconsin this 1st day of November, 2022.

BY THE COURT:

HON. PAMELA PEPPER
Chief United States District Judge